254 A.2d 443 (1969)
In re ONE MINOR CHILD.
Supreme Court of Delaware.
January 7, 1969.
A. Richard Barros, of Brown & Brown, Dover, for plaintiffs below, appellants.
James M. Faulkner, of Tease, Faulkner & Dunlap, Georgetown, for defendants below, appellees.
WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.
HERRMANN, Justice.
This appeal involves the custody of a boy age 10. The Family Court granted permanent custody to foster parents, whereupon the natural parents appealed to the Superior Court. That Court reversed and granted custody to the natural parents, whereupon the foster parents appeal to this Court.
The determinative question on this review is the correctness of the conclusion of the Superior Court that it is now in the best interests of the child to remove him from the custody of the foster parents and place him in the custody of the natural parents. Nelson v. Murray, Del., 211 A.2d 842 (1965). Accepting the findings of fact made by the Superior Court, we are of the opinion that the ultimate deduction drawn therefrom is clearly wrong; and that justice requires us to draw and substitute our own deduction which is to the contrary. See Lank v. Steiner, Del., 224 A.2d 242 (1966).
The facts found by the Superior Court, or standing undisputed on the record, are substantially as follows:
The child was born on January 31, 1959 to a family having four other children. Upon complaint filed by the State Department of Public Welfare, the Family Court found that the parents were guilty of neglect of the children. On December 30, 1959, when 11 months old, the boy here involved was placed in the home of the foster parents, appellants herein, his temporary custody being vested, together with that of the other children except the eldest, in the Department.
The boy remained in the home of the foster parents continuously from December 30, 1959 until June 22, 1967, a period of 7½ years. On that date, the Department removed the child to the home of the natural parents which by that time housed *444 their six other children. The foster parents contested this action by petitioning the Family Court for permanent custody. That Court denied the relief sought, directing that temporary custody remain with the Department, with authority to proceed with its plan to return the child to the home of his natural parents, pending investigation by the Family Court and a full hearing on permanent custody. On October 12, 1967, after hearing on the foster parents' petition for permanent custody, the Family Court terminated the temporary custody awarded to the Department in 1959 and awarded permanent custody to the foster parents, directing that the child be returned forthwith to the latters' home. On appeal therefrom, the Superior Court reversed and, on March 14, 1968, granted permanent custody to the natural parents.[1]
Referring to the natural parents, the Superior Court stated:
"* * * The father obviously was an alcoholic. He has sought and received help, and, as a result, he is now able to hold a steady job as janitor of a church. The Mother is a filthy dirty housekeeper, but apparently she is trying to improve. The children are not the most healthy and appear to be partially retarded, but those who are home are happy and live together as a family. There is no doubt in my mind after reading the record and hearing the testimony of the School Nurse, the Schoolteachers and the other witnesses that the parental home conditions are extremely poor according to normal standards. I am convinced that the children at home come to school dirty, and they may not get all the nourishment or medical attention they would have in a different environment, but I cannot restrict my thinking in this matter to today. I must project my thoughts into the foreseeable future in determining what is best for the child here concerned."
Referring to the foster parents, on the other hand, the Superior Court stated:
"The home of the foster parents and their position in society cannot be compared with that of the natural parents. The are good people with above average income. They have a nice home and home life. They have one grown son, and they love and provide for this child as if he were their own. The foster mother is fifty-one years of age, and the foster father is fifty-three. They have made this child happy, and he has made them happy during these eight years that they have raised him from infancy. * * *."
With reference to the child's health and welfare, the Superior Court stated:
"This child has had a good beginning. When he was placed in the foster home on 1959 he was pale and lethargic. Upon examination it was discovered that he was anemic, probably because his diet had consisted to that time of nothing but milk. He was treated well by his foster parents under the doctor's care and by the time he was six years old he was doing well physically although he might still be considered as a frail child. When asked for an opinion the Doctor by letter of May 4, 1965 indicated that it would be a great detriment if the child was returned to his natural home. In his opinion the natural parents are absolutely unable to give the care he needs. This same opinion was elicited at the hearing on this appeal. As a matter of fact he indicated that the child's health might slip back if returned to his parents, and that it would be a traumatic experience to take the child out of the foster home. The Doctor's observation of this child his parents and his foster parents necessarily is limited at most."
*445 As to the attitudes of the child, the Superior Court stated:
"When I privately interviewed this child he appeared to be happy indeed. He was effervescent and outgoing and I had no effort in leading him into conversations, although he would have me believe that he was unhappy with his natural parents and his real brothers and sisters during his summer with them when the Family Court placed him there on June 22, 1967 upon the recommendation of the Welfare Board. He would have me believe that he was made to work, that he was underfed, or perhaps I should say he did not get food like he enjoys and gets at his foster home. This, of course, is corroborated by his Schoolteachers and the School Nurse who testified that upon his return to school while at the home of his natural parents, he was dirty, poorly disciplined, maladjusted, unhappy and a completely different type child than he was and is in his foster home. * * *."
The foregoing extracts contain the basic factual findings made by the Superior Court.[2] Those findings notwithstanding, the Superior Court reached the following ultimate conclusion:
"* * * I am sufficiently convinced by a preponderance of the evidence found in the record of the Department of Welfare, in the testimony of the workers from that Department and from the testimony of the Minister who observes and works with this family constantly that as between the two, custody should be in the natural parents. This custody, however, should be strictly supervised by the Department of Welfare until such time as a proper adjustment is made."
The Superior Court's letter opinion does not reflect the nature of the testimony of the Welfare Department workers and the Minister upon which the Court's ultimate conclusion was based. We have examined the record of their testimony:
The Welfare Department workers testified that the infrequent visitations by the natural parents to the child in the foster home and in a nearby church were cold, unsuccessful meetings in which there was little communication and no demonstration of affection; that the child was overprotected by the foster mother, had feelings of insecurity, and resisted the advances of social workers and his natural parents; that the foster home is the only real home the boy has ever known and he has refused to accept or respond to his natural parents and siblings; that the foster parents could not adopt the boy because termination of parental rights would not be possible under the circumstances; that a firm parent-child relationship has developed between the foster parents and the child whereas it is doubtful that the boy has any feelings for his natural parents; that the foster mother is highly emotional about the situation, has a subconscious need to keep the boy, and cannot assist the boy to relate to his natural parents; that visitations by the natural parents result in emotional upset of the boy. The Department staff members further testified that they concluded that the natural parents have progressed economically and as a family unit to the point where "the children would be fairly safe in returning to their parents"; that the natural parents were ready for the return of the child and that "they had reached a stage where we felt they could give him adequate care"; that after his return to the natural parents during the Summer of 1967, the boy began to relate well with them and his siblings.
*446 The Minister, to whom the Superior Court referred, testified that, in 1962, he employed the natural father as custodian and janitor of his church; that he helped the father to overcome habitual drunkenness, including obtaining his release on bail on a number of occasions; that for at least 18 months the father has worked well in his job and has not been drinking; that the housing and home conditions of the natural parents have become progressively better and is "a continuously improving situation", although "dirt is a relative thing"; that the natural father shows affection for his children and there is a good family relationship among the natural parents and their children; that the Minister helps the natural father handle his money and pay his bills; that the home of the natural parents is like others in their economic status; that the boy should be taken out of both homes and put in a third home where he would learn to know his natural parents in a natural way.
The above summarizes the testimony of the Welfare Department workers and the Minister upon which the Superior Court based its ultimate conclusion that the best interests of the child would be served by removing him to the home of his natural parents.
We think it self-evident from the foregoing factual statements that the conclusion of the Superior Court was clearly erroneous. It seems manifest to us from the factual situation set forth above that the best interests of the child will not be served by removing him from the only home he has ever really known to a new and strange environment; from a clean and orderly home to dirty and disorderly surroundings; from a home in which he was kept clean, healthy, and well-groomed to one in which he became dirty, infected, and ill-kempt. It is clear to us that it is not in the best interests of the child to take him from the care of those who, for 9 of his 10 years, have given him extraordinary love and attention and have developed a genuine parent-child relationship, only to remove him to people who are actually strangers, comparatively indifferent to his welfare, and with whom no real parent-child relationship has ever developed.
The decision of the Family Court, in our opinion, was clearly correct. In line therewith, we reverse the judgment of the Superior Court and remand the cause with instructions to affirm the Family Court judgment.
In view of this result, we do not reach the other ground of appeal.
NOTES
[1] Custody has remained in the foster parents, however, pending the outcome of this appeal.
[2] Supplementing the Superior Court's recitation of the evidence, it is noteworthy that the School Nurse, referred to, concluded that children should not be permitted to live in conditions such as she observed in the home of the natural parents in September 1967. One of the school teachers concluded that it would be a "grave injustice" to the child to remove him to the home of the natural parents. The Doctor testified that it would be a "traumatic experience", detrimental to the child physically and emotionally, to remove him from the foster home.