**Dorothy MARTIN * and James Martin *,**
**Petitioners,**

**v.**

**Brenda SAND * and Gary Sand *,**
**Respondents.**

Family Court of Delaware,
New Castle County.

Submitted Feb. 3, 1982.
Decided Feb. 22, 1982.

* A pseudonym adopted to protect the privacy of the parties.

Louis B. Ferrara, Wilmington, for petitioners.

Alene S. Berkowitz, Wilmington, for respondent, Brenda Sand.

Gary Sand, Respondent, pro se.

Carol S. Widing, Deputy Atty. Gen., Wilmington, for Division of Social Services.

GALLAGHER, Judge.

Essentially, this custody case involves five people. The main person is Daryl Sand (Daryl), born March 2, 1978. Daryl is the object of a three-sided controversy. The contestants are his mother, Brenda Sand

(mother), his father, Gary Sand (father), and Dorothy and James Martin, de facto custodians. Father opposes mother and the de facto custodians, while the de facto custodians oppose mother and to a lesser extent, father. When considering the contest between the parents, the court will apply the standards set forth in 13 *Del.C.* § 722. When considering the contest between the parents and the de facto custodians, the court must determine whether Daryl is dependent, neglected or delinquent as those terms are defined in 10 *Del.C.* § 901.

On January 16, 1981, the court awarded temporary custody of Daryl to Mrs. Martin. On May 2, 1981, while Daryl was in the custody of Mrs. Martin, mother spirited him away and out of state along with his half-brother Philip. This action made it necessary to postpone an earlier scheduled hearing on the custody issue. However, on or about May 19, 1981, mother returned Daryl to the Martin home and the court entered an order permitting mother to visit Daryl in that home for two hours on Wednesday, Friday and Sunday of each week. On September 8, 1981, the court granted temporary custody of Daryl to the Division of Social Services (DSS), but left his primary care with the de facto custodians. Also on September 15, 1981, Susan Sandler was appointed to act as Daryl's guardian ad litem.

Hearings were held on the petitions on December 7, 8, 9, and 18, 1981. Many witnesses testified and numerous exhibits were received in evidence. Following the hearings, the court interviewed Daryl and his half-brother, Philip, exchanged correspondence with counsel, including counsel for DSS who gratuitously requested legal guidance relative to its responsibilities, and became involved in controversy over the methods used to transport Daryl to the court for judicial interview, all culminating in advice by me to counsel by letter dated February 3, 1982, that I would decide the case without a further child interview and without further input from counsel.

This is the court's decision on the petitions and counter petitions for custody. Naturally, I cannot recite all of the evidence; but I will refer to what I regard as the truly significant evidence.

### I.

On or about March 22, 1978, mother was involved in an automobile accident which incapacitated her from caring for her family. At that time, mother and father were living together along with Philip, then five years old, the child of mother, and Daryl. It appears that although father and mother went through a marriage ceremony, father is still married to a woman in New York and is now living with and engaged to be married to another woman in Elkton, Maryland. Legally, it would appear, father and mother were never married.

On or about May 6, 1978, Mrs. Martin was employed as a homemaker by a private agency and was assigned to care for the Sand family. When Mrs. Martin arrived at the Sand residence, there was no food in the house for either the children or the adults. Mrs. Martin, using her own funds, purchased groceries for the family and milk for Daryl. When it came time for Mrs. Martin to leave at the end of her work day, Mr. Sand was not available to help care for the children and Daryl, who was only two-months old, was in his crib crying. Mrs. Martin asked mother what she would do with the baby until her husband came home at approximately 9:00 p. m. and mother said that the baby would have to lie there and cry. At that juncture, Mrs. Martin offered to take the child home with her and return him the next morning, when she returned to care for mother. Mother readily agreed to that proposal.

From May 6, 1978, until the present time, almost four years later, Daryl has resided almost exclusively with Mr. and Mrs. Martin. During the year 1978, Mrs. Martin brought Daryl home every evening and kept him on the weekends. If Daryl visited at all with his parents, it was only for very brief periods of time. Even when Daryl was with his parents, Mrs. Martin would receive telephone calls from mother requesting her to come and pick up Daryl prior to the time the visit was to end. Mr.

and Mrs. Martin saw to all of Daryl's medical needs with Drs. Martinez, Terris and DiSanto. From June 26 until November 6, 1978, Daryl spent only occasional hours with his parents. From August 5 to August 9, 1978, the Martins took Daryl on a vacation trip to Maine. From 1978 through 1980, Daryl spent substantially all his time with Mr. and Mrs. Martin. The time spent with his parents averaged approximately weekends throughout the two-year period.

On August 31, 1979, the Sands signed an *inter vivos* appointment of a guardian of Daryl to Mr. and Mrs. Martin. A copy of that document is in evidence. While Daryl has been with the Martins, they have expended various sums of money purchasing food and clothing for him and have received no reimbursement whatever from either of the Sands.

On May 31, 1980, the Sands separated and Daryl divided whatever time that he spent with his parents between them. On Friday, January 16, 1981, Dorothy Martin was contacted by mother saying that unless she received $150 from Mrs. Martin by 12 noon on that day, she was taking Daryl to California. This telephone demand was repeated substantially to Mr. Martin on the afternoon of the same day. The Martins refused to pay the money and refused to return Daryl to mother.

It seems obvious that for some period of time mother was incapable of caring for Daryl due to injuries received in the accident. However, as time went by she came to lean on Mr. and Mrs. Martin and did not assume her responsibilities as a mother. This was commented upon by father and by Mr. and Mrs. Martin. Earlier, in September 1979, father and the Martins encouraged mother to spend more time with Daryl. Mother tried this for a week but gave up because she didn't like it, and she continually returned Daryl to Mrs. Martin. She said that her needs came before Daryl.

Mother spent considerable time with men. One witness testified that on one occasion there were 12 men in her apartment smoking marijuana. At one time or another she has had plans to marry at least three other men. The names Ken, Bill, Paul, Martin, Gene, and Gary were all mentioned.

At this point in time, mother does not have a home of her own. She lives in her mother's house. When the children are with her, they live with her and the various other people in her mother's home.

Mother had witnesses testify to her attachment to religion and church. But it was obvious, from the testimony of Sister Jones and Reverend Newsome that mother has very little to do with the church and, as Reverend Newsome said, "It looks like she got religion when she needed it." Reverend Newsome said that he had not seen Daryl in church.

Mother's indifferent care for her son Philip is also significant. Philip has spent a lot of time at maternal grandmother's home. He has not done well in school, and little attention has been given to his medical needs. He has been the subject of physical discipline. Dr. Owen Lugar, a psychologist, in a report dated November 12, 1981, stated that: ". . . Emotionally quite dependent and immature Philip should be seen for psychological care to help him feel more secure. His mother should also consider attendance at a parenting class to facilitate more consistence on her part. This lad's dependence could be related in part to his perception of a very dependent mother. Psychological care; i.e., therapy, would be helpful in light of a need to explore his relationships with others in more detail. Psychometrics indicate superficial peer relations at best, with an overdependence on his mother."

One witness testified to seeing Philip playing in a garbage dumpster. She reported that Philip was filthy. There was evidence that Philip has seen his mother in sexual play with a male adult, that he was much delayed in his toilet training, has had a poor school attendance record and poor school performance.

A report from Dr. Lugar contains the following observations of mother:

"Projective assessment pictures a person who feels overwhelmed. (Mother) is like-

ly to be quite defensive about herself. There are feelings of inadequacy suggested by the drawings. This is a mother who is likely to be growing up with her children. She is overly concerned about appearance and acceptance by others. She is moody and hostile. She works hard at controlling her temper, but has a low frustration tolerance. She feels directionless, and is liable to be dependent upon others for guidance.

(Mother) is a twenty-three year old woman of Average intellect and academic skills. She is significantly apprehensive, and it is felt that she could have accomplished significantly more on the achievement instruments had she really tried. Psychologically she frustrates easily, and is mistrustful. It is likely that she could foster more dependence in her children than is necessary because they offer her the most security via dependence. She may rely heavily upon power as a parenting technique, yet may fear rejection of her son, so may be inconsistent."

But father hardly qualifies as a replacement for mother. Father is genuinely interested in Daryl, but is in no position to assume custody. He is beset by his own personal problems. However, it is clear that father would rather Daryl be with Mr. and Mrs. Martin and not with mother. He visits freely with Daryl at the Martins. Father feels that mother has serious problems that would adversely affect Daryl if he were in her custody.

In her report dated July 8, 1981, Kathleen O. Rossi, court counselor, made the following observations:

"It appears that each of the parties share some liability in these regretable circumstances. (mother), for whatever reason, appears to have, for all intents and purposes, turned over care of her child to (Mrs. Martin) since his birth, according to the information I gathered. A document designating that Daryl would live with the (Martins) during his minority was signed by her on August 31, 1979. It was *not* the case that (mother) brought this matter before the court when she per-

ceived the (Martins) as usurping her role and responsibility, although she now strongly contests the (Martins') quest for custody.

(Father) seems to present himself, to some degree, as a hapless victim of his wife's wiles. However, even if he did not play an active role in sending Daryl off to the (Martins), he was a (mostly) silent conspirator . . . (Mr. and Mrs. Martin) admittedly have a more stable situation than either (Mr. or Mrs. Sand) at this time."

I interviewed Philip and Daryl on January 11, 1982. The boys seem comfortable together. Daryl told me that he lives with his grandma, doesn't have a mother, that his father is Pop Pop Martin, Mrs. Martin is his grandmother, that he loves Mr. and Mrs. Martin, doesn't talk on the telephone with his mother, and that he was tired and wanted to go home and home is where the Martins reside. It seemed to me that Daryl regards Mr. and Mrs. Martin as his psychological parents.

Certain conclusions are obvious. Neither father nor mother are adequate parents. Both are immature and irresponsible. They have permitted a situation to be created whereby Daryl has been integrated into the Martin home and now Daryl regards Mr. and Mrs. Martin as his psychological parents. When mother had the physical care of Daryl, this was most unsettling for her and she willingly agreed to turn Daryl over to Mr. and Mrs. Martin with the result that they have assumed the parental role almost to the exclusion of mother and father. Now mother or father would like to resume control over Daryl and eliminate Mr. and Mrs. Martin as psychological parents. Mr. and Mrs. Martin have raised Daryl to a point where his physical care is no longer the burden it once was for mother so she is willing now to have him returned to her. What she does not recognize is that in many respects Daryl is no longer her son, but is the son of Mr. and Mrs. Martin.

Dr. Leland Orloff, a psychologist, testified that the two homes were confusing for Daryl and that he should be in one home or

the other. He observed that Mr. and Mrs. Martin demonstrate strong parental roles. He also emphasized that if mother were to resume custody, Mr. and Mrs. Martin should remain in the picture.

Michael Pyser from DSS testified that his role as a DSS worker is to preserve the family. He considers mother a "DSS client." While he thinks that mother is able to provide for Daryl's minimal standards, he still has reservations about her. He feels that DSS should remain in the picture, that mother needs a parenting course, that family counseling is needed, and that it is important for mother's emotional well being, not Daryl's, that Daryl be returned to her.

## II.

Natural parents have first right to the care and custody of their children. *In re Two Minor Children*, Del.Ch., 283 A.2d 859 (1971). This right will not be abrogated on a showing that a non-parent is able to provide the child with an easier or more luxurious life and greater prospective inheritance than the natural parents. *In re Klugman*, Minn.Supr., 256 Minn. 113, 97 N.W.2d 425, 430 (1959). It is only when the court finds dependency, neglect or delinquency that a child may be removed from the custody of an unwilling parent or parents and granted to the custody of a non-parent. *See*, 10 *Del.C.* §§ 901, 921, 937.

13 *Del.C.* §§ 721–731, deal only with the rights of parents in child custody actions. Although a non-parent might intervene with court permission in such a proceeding (*see*, § 721), the court has no authority to grant custody to a non-parent under 13 *Del.C.* ch. 7, subch. II. *See Linda U. v. Florence A. McG.*, Del.Fam., Civil Nos. 4130, 3910 (March 31, 1981); *Bender v. Bender*, Del.Fam., Civil No. 6961 (July 16, 1981).

Several decisions indicate that the "best interest" standard should be applied in a contest between a parent and a non-parent as it is applied between parents. Two of these cases, *In re One Minor Child*, Del. Supr., 254 A.2d 443 (1969) and *In re C. M. D.*, Del.Supr., 256 A.2d 266 (1969), can be distinguished because they were decided before 13 *Del.C.* §§ 721–731 became operative. Other cases, *D. S. S. v. S. S. L.*, Del.Fam., Civil Nos. A–3354, S–8998 (February 17, 1976), *C. F. B. v. A. P. C.*, Del. Fam., Civil No. B–1291 (June 6, 1977), *R. A. D. v. M. E. Z.*, Del.Super., 414 A.2d 211 (1980), *Gerald and Margaret D. v. Perry R.*, Del.Fam., Civil No. 9104 (November 17, 1980), *In re M. B.*, Del.Fam., Civil No. 26794 (December 12, 1980) and *Crawford v. Children's Bureau*, Del.Fam., Civil No. C–9476 (January 1, 1981), are reconcilable with the decision about to be made because they were concerned, in the main, with situations where the custodial arrangement judicially created approached permanency. I believe that if these cases had been decided subsequent to July 9, 1981, when this court was first given authority to appoint personal legal guardians for minors (10 *Del.C.* § 925(16)), guardians would have been appointed rather than legal custodians where the contest was between a parent and non-parent.

*R. A. D. v. M. E. Z.*, Del.Super., 414 A.2d 211 (1980), is somewhat troublesome because it does not distinguish controversies between parents from those between parents and non-parents. It seems that the court held that the maternal grandmother had standing to file a petition for custody even though there was no preliminary finding of dependency, neglect, delinquency or termination of parental rights, and that the court might grant custody to her under 13 *Del.C.* §§ 721–731. This holding is clearly at variance with other decisions here cited. Since the Superior Court is not a court of last resort whose decisions are binding precedents, this court may disregard a Superior Court decision that it feels is "clearly wrong." *See Mayor and Council of Wilmington v. Saint Stanislaus Kostka Church*, Del.Supr., 10 Terry 5, 108 A.2d 581 (1954). Consequently, I am free to limit application of the best interest standards promulgated by 13 *Del.C.* § 722 to custody disputes between parents. *Crawford v. Children's Bureau*, supra.

■ Although this court only has authority to remove a child from the custody of his parent or parents where the child is dependent, neglected or delinquent, once a decision has been made to effect removal, the court may grant either temporary custody of the child to a non-parent or designate a non-parent (other than an agency) as guardian of the child.

■■ Appointment of a guardian supercedes the authority of a custodian. *In re Bunting*, Del.Supr., 311 A.2d 855 (1973). Custody involves immediate care and control of the child while guardianship indicates not only these responsibilities but those of a parent, *in loco parentis*, as well. *In re Two Minor Children, supra.* In considering whether to appoint a guardian of the person for a minor, the court must determine whether the appointment is in the best interest of the child. *In re Two Minor Children, supra; In re Erich*, Del.Ch., 310 A.2d 910 (1973). The standards for determining best interest are quite general and not defined by 13 *Del.C.* § 722.

■ If the court finds a child to be dependent, neglected or delinquent (the adverse conditions), then it must decide whether to grant temporary custody of the child to a non-parent or designate a non-parent as guardian of the child's person.

■ Temporary custody will be granted where the adverse conditions are likely to be eliminated in the reasonably foreseeable future. Such an award contemplates a return of the child to the parent or parents in the reasonably foreseeable future.

■ A guardian of the person will be appointed where the adverse conditions are not likely to be eliminated in the foreseeable future. Such an appointment contemplates *in loco parentis* relationship that may be limited in time by the court or may approach permanency and even lead to the filing of a petition for termination of parental rights under 13 *Del.C.* ch. 11.

■ Where there has been a grant of temporary custody, the child will not be returned to the parent or parents unless it is established that the circumstances that led to the grant of temporary custody no longer exist and are not likely to reoccur. Analysis of past events and future predictability are equally important and merit detailed consideration. A "band aid" approach looking narrowly to the present ability to provide for the child's minimal needs is unacceptable.

■ Where a guardian has been appointed, the child will not be returned to the parent or parents unless it is in the child's best interest, measured by home environment, emotional ties, age, sex and health of the child, desirability of the non-parent relationship, preference of the child and other relevant factors. *See Turner v. Pannick*, Alaska Supr., 540 P.2d 1051, 1053 (1975). This approach assumes that dependency, neglect or delinquency no longer exist, is unlikely to reoccur, and in addition requires that for the parent or parents to prevail in the custodial controversy, the child's best interests must no longer favor retention of custody by the guardian.

The principles here promulgated are child oriented. They recognize that a new and promising life must be made possible for a child whose best interests mandate displacement of the parental relation. Psychological parentage may challenge actual parentage for recognition. Where a child is removed from parental custody, new relationships with the child necessarily arise and must be dealt with. State or private agencies, guardians, foster parents, legal and de facto custodians and relatives may be interacting with the child and/or with the child's parent or parents. Therefore, if the child's best interests are to be protected and advanced, this court, as an independent forum, must consider, resolve and adjudicate controversies involving these competing interests.

### III.

■ Based upon all the evidence submitted at the trial, I have reached certain conclusions:

1. Daryl is still a dependent child so far as his parents are concerned, was dependent

when the original petition was filed by Mr. and Mrs. Martin and continues to be dependent.

2. The dependency is not likely to be eliminated in the foreseeable future.

3. Neither mother nor father has the parenting capability and skills that would indicate that Daryl should be returned to the custody of either of them in the foreseeable future.

4. Both mother and father have failed to plan adequately for Daryl's physical, mental and emotional needs, health and development.

5. It is in Daryl's best interests that Mr. and Mrs. Martin be named guardians of his person.

Accordingly, custody of Daryl is removed from DSS, the petitions of mother and father for custody of Daryl are denied, while the petition of Mr. and Mrs. Martin for custody of Daryl is granted; and their custodial relationship to Daryl shall be that of guardians of the person. Mother may visit with Daryl on the first Saturday of each month and father may visit with him on the third Saturday of each month. The visitations shall take place at the Martins' residence between 1:00 p. m. and 4:00 p. m. In addition, mother and father may visit with Daryl at such other times at may be agreeable to them and the Martins.

IT IS SO ORDERED