In re the Matter of Blake Sebastian
**BANCROFT**

v.

Tabitha **JAMESON.**

**Raymond Nickelson**

**In the Interest of Breanna
M. Nickelson DOB:
[Redacted].**

No. CS09–03603.

Family Court of Delaware,
Sussex County.

Submitted: Dec. 23, 2009.

Decided: July 15, 2010.

Stephen Welsh, Esquire, Law Office of
Edward C. Gill, P.A., Georgetown, DE,
Attorney for Blake Sebastian Bancroft.

Tom Bodie, Esquire, Lewes, DE, Delaware Volunteer Legal Services, Attorney
for Tabitha Jameson.

Raymond Nickelson, Pro Se.

## OPINION

HENRIKSEN, J.

On July 06, 2009, the Delaware Legislature amended Delaware's Uniform Parent-

age Act to include a provision establishing and defining a *de facto* parent.[1] Reviewing the circumstances of the present action in light of the recent *de facto* parent amendment begs the question: How many parents can a child have? In considering this basic question, does Delaware's recently added *de facto* parent statute violate an existing parent's due process rights as guaranteed by the 14th Amendment of the Constitution of the United States as well as Article 1, Section 9, of the Constitution of the State of Delaware?[2] For the reasons hereafter stated, the Court holds the *de facto* parent statute, upon which Petitioner relies to have standing to seek custody of a child not his biological child, and where the child already has two fit parents, violates the due process rights of the child's biological parents. As such, Petitioner lacks standing to bring his action, and his case must be dismissed.

### Setting the Stage: Smith v. Gordon

The legislative amendment to Delaware's Uniform Parentage Act, which established and defined a *de facto* parent, was likely created in response to the Delaware Supreme Court's Decision of February 03, 2009, in the case of *Smith v. Gordon.*[3] In *Smith v. Gordon*, the Delaware Supreme Court held a former lesbian partner of a child's adoptive mother did not have standing to seek custody of the adopted child under the claim of being a *de*

*facto* parent.[4] The Delaware Supreme Court determined it was not for the Delaware Judiciary to expand the definition of a parent-child relationship beyond what the Delaware Legislature had already set forth in a law which unambiguously defined the parent-child relationship.[5] Even more, the Delaware Supreme Court stated the Delaware Legislature clearly declined to include the *de facto* parent definition in Delaware's Uniform Parentage Act despite the Legislature's knowledge of such a doctrine being considered in certain other states around the country.[6]

Likely in response to the decision in *Smith v. Gordon,* the Delaware Legislature quickly amended Delaware's Uniform Parentage Act on July 06, 2009 to include a *de facto* parent provision.[7] The *de facto* parent amendment expanded the definition of what relationships could qualify as a parent-child relationship. The amendment states the *de facto* parent relationship will be established if the Family Court determines the person claiming to be a child's *de facto* parent can demonstrate the existence of the following three factors:

1) Has the support and consent of the child's parent or parents who fostered the formation and establishment of a parent-like relationship between the child and the *de facto* parent;

---

1. Pseudonyms have been substituted for the names of the parties pursuant to Supreme Court Rule 7(d); The historical and statutory notes indicate the Delaware Legislature added sections (a)(4), (b)(6), and (c) to DEL.CODE ANN. tit. 13, § 8–201 in 2009. 77 Del. Laws, ch. 97 (2009).

2. The expressions "due process of law," as it appears in the federal Constitution, and "law of the land," as it appears in Article I of the Delaware Constitution, have substantially the same meaning; (*Aprile v. State*, 143 A.2d 739, 744 (Del.Super.Ct.1958)), aff'd, 146 A.2d 180

(Del.1958); (*Matter of Carolyn S.S.*, 498 A.2d 1095 (Del.1984)).

3. *Smith v. Gordon*, 968 A.2d 1 (Del.2009).

4. *Id.* at 15.

5. *Id.* at 14–15.

6. *Id.* at 14.

7. DEL.CODE ANN. tit. 13, § 8–201(a)(4) and (b)(6) (2010).

2) has exercised parental responsibility for the child as that term is defined in Section 1101 of this Title; and

3) has acted in a parental role for a length of time sufficient to have established a bonded and dependent relationship with the child that is parental in nature.[8]

In reading the foregoing provisions, one must take particular note of the wording contained in the above Subsection 1, where it states the person claiming to be the *de facto* parent "has had the support and consent of the child's *parent or parents* (Emphasis added) ..."[9] The crux of the issue before this Court lies particularly within the language just emphasized, where the language appears to clearly suggest a child, although already having two fit parents, may now have a third parent, or perhaps even more parents.

### Facts of Case Sub Judice

Blake Sebastian Bancroft, hereinafter referred to as "Boyfriend," has filed for custody of 9 year old Breanna Nickelson, hereinafter referred to as "Child," born [REDACTED]. Boyfriend avers the *de facto* parent amendment gives him standing to seek custody of Child, a child who is not Boyfriend's biological child. Child's biological parents are Tabitha Jameson, mother, and Raymond Nickelson, father. Mother and Father share joint custody of Child, with Child residing primarily with Mother, and Father having visitation, pursuant to a Consent Order dated June 28, 2005.

Child's biological father, as well as his extended family, visits Child on a regular basis. Father has also maintained his child support.[10] Visitation for Child's paternal grandparents was specifically provided for in the Consent Order entered into between Mother and Father dated June 25, 2005, in response to a petition filed by Paternal Grandparents.

Boyfriend has lived with Mother for the past 5 years. During those 5 years, Mother and Boyfriend never married. However, Mother and Boyfriend have a child together, 5 year old Molly, born [REDACTED]. Nine year old Child has lived in the home occupied together by Mother, Boyfriend, and Child's 5 year old half-sibling, during the 5 years Mother and Boyfriend resided together. Boyfriend filed a Petition for Custody of 9 year old Child, as well as a Petition for Custody of his 5 year old biological daughter, shortly after Boyfriend and Mother separated around December 18, 2009.

Although Boyfriend's initial Custody Petition of Child, wherein he alleged he has standing to file as a *de facto* parent, alleged both of Child's biological parents consented to him assuming parental responsibilities, both parents have filed affidavits denying their consent. Boyfriend also averred in his initial petition that Biological Father was not involved in Child's life. This allegation has also been denied. Finally, in Boyfriend's Petition for *De facto* Custody, he claimed Child's best interest would be served by allowing Child to reside primarily with Boyfriend.

In an emergency affidavit filed along with his Custody Petition, Boyfriend alleged he should be awarded joint custody of Child along with the biological parents,

---

8. DEL.CODE ANN. tit. 13, § 8–201(c) (2010).

9. DEL.CODE ANN. tit. 13, § 8–201(c)(1) (2010).

10. Although this information concerning extended family contact and payment of child support is only supported at this stage of the proceedings by affidavits accompanying the pleadings, the Court does not consider these factors as critical in its eventual decision.

and he should also be awarded primary placement of Child. The only allegation Boyfriend made in his initial pleadings that might even remotely suggest Child was not properly being cared for by her biological parents was found in the emergency affidavit, wherein Boyfriend requested Child's biological parents be granted supervised visitation. Boyfriend alleged nothing about Child's biological father's ability or inability to care for Child. As to Mother, Boyfriend's only concern was that Mother had threatened to take Child and go to another state. The Court is aware that Mother at one time took Child to another state, and the Court had to issue an Order, at Father's request, seeking another state's assistance in bringing Mother and Child back to the state for litigation between Child's biological parents. However, Mother stated her reason for leaving was to get her and Child away from the domestically violent atmosphere in which she was living with Boyfriend.[11] As already noted, Mother and Father were thereafter able to arrive at a Consent Custody and Visitation Order regarding Child.

Except for the concern that Mother might leave the state with Child, nothing in Boyfriend's pleadings suggested Child was not being adequately cared and provided for by Mother or Father. In fact, in a memorandum filed by Boyfriend's attorney on February 12, 2010, the second paragraph states, "it is in the best interest of both [Child's half-sibling] and [Child] to primarily reside with [Boyfriend] with both [biological parents] receiving *liberal visitation* (Emphasis added)." The sum and substance of all of Boyfriend's pleadings fails to indicate any suggestion that Child was either dependent or neglected in the care of her parents.

*Delaware Uniform Parentage Act*

The Delaware Supreme Court's Decision of *Smith v. Gordon* provided an extensive history of the development of Delaware's Uniform Parentage Act ("UPA").[12] The National Conference of Commissioners on Uniform State Laws ("NCCAUSL") promulgated the first version of a Uniform Parentage Act in 1973.[13] The Supreme Court's Opinion indicated the UPA was intended to identify "two legal parents for both marital and non-marital children."[14] The Supreme Court's Decision also indicated the main thrust of the original Act

---

11. The Court's Order of October 30, 2003, involved in litigation between Child's biological parents reflects Boyfriend provided testimony at a prior emergency hearing on October 08, 2003, during which Boyfriend made allegations against Mother suggesting she did not treat the child correctly and that the Division of Family Services had been involved removing Child from Mother's care. Boyfriend's assistance to Biological Father in providing testimony in support of Biological Father's desire to have his child returned to Delaware somewhat negates, at least as of 2003, Boyfriend's allegations that Father was not involved in Child's life. However, the October 30, 2003 Order reflects the Court's concern with Boyfriend's credibility, when he testified Mother was "a great mother, a loving mother, and that he had never seen Mother hit [Child]." Boyfriend also testified at the October 30, 2003 hearing that he was no

longer clear on his earlier testimony which suggested DFS had taken children from Mother's care. Consistent with Mother's present affidavit, however, was her testimony at the October 30, 2003 hearing that "she left the home of [Boyfriend] and moved abruptly to South Dakota because of the physical abuse she was experiencing from [Boyfriend]." The Court also notes its Order of October 30, 2003, at page 4, reflects the Court did not find Mother's excuse convincing at that time. Mother eventually returned to residing with Boyfriend.

12. *Smith v. Gordon*, 968 A.2d 1, 9–10 (Del. 2009).

13. *Id.* at 9.

14. *Id.*

was to assert the rights of children born out of wedlock in civil paternity actions against fathers, and also to bring a maternity action in rare cases where the identity of the biological mother might be disputed.[15] The State of Delaware basically adopted the 1973 version of the UPA in 1983.[16]

The Decision in *Smith v. Gordon* went on to note how, in 1988, in response to the increasing use of assisted reproduction and surrogacy agreements, a new Uniform Act was promulgated for states to consider, the Uniform Status of Children of Assisted Conception Act ("USCACA").[17] The purpose of the USCACA was to establish the legal parents of children born as the result of assisted reproduction. The USCACA was then followed with the Uniform Putative and Unknown Fathers Act ("UPUFA") with procedures for identifying putative and unknown fathers and for terminating their parental rights.

The National Conference of Commissioners on Uniform State Laws ("NCCUSL") revised the UPA in 2000.[18] As noted in *Smith v. Gordon*, the revised Act, although continuing the purposes of the original 1973 version, particularly for purposes of identifying fathers, also incorporated the 1988 USCACA and UPUFA as new technology was making it possible to identify fathers with greater certainty through genetic testing.[19] The UPA was further amended in 2002, so that a child of unmarried parents would be treated equally as a child of married parents.[20] It is interesting to note in the 2000 revisions, that a husband who consented to his wife's assisted reproduction was considered the legal father of the resulting child, even though he was not the biological father.[21] The 2000 revision which required the marriage of a husband and wife who intended to become the parents of a child born as a result of a surrogacy agreement, eventually in 2002 changed the terms "husband" and "wife" to "man" and "woman" so that an unmarried couple entering into a surrogate relationship would not be treated differently than a married couple.[22] This change of wording, however, did not permit a child born to an unmarried same sex couple as a result of assisted reproduction to have two legal parents.[23] As will be seen later in this Opinion, this omission, when considering same sex couples who have planned to have and raise a family together, has led many Courts around the country, including Delaware in *Smith v. Gordon*, to later address this issue.[24]

The Delaware Supreme Court in *Smith v. Gordon* also commented on the requirements for establishing maternity and paternity under the American Law Institute ("ALI") requirements.[25] The Court's Decision goes into some detail about the ALI's definitions of a parent, being a legal parent, a parent by estoppel, or a *de facto* parent. As noted in *Smith v. Gordon*, ALI also explains that other individuals such as a stepparent or non-marital partner of a legal parent may function as a parent and

15. *Id.*

16. *Id.* at 12.

17. *Id.* at 9.

18. *Id.* at 9–10.

19. *Id.* at 9.

20. *Id.* at 9–10.

21. Uniform Parentage Act § 703 (2000).

22. Uniform Parentage Act §§ 703, 801(b) (2000) (amended 2002).

23. *Smith v. Gordon*, 968 A.2d at 10.

24. *Id.* at 12–14.

25. *Id.* at 10–11.

be recognized as a *de facto* parent. However, the ALI's restrictions are said to be rigid "to avoid unnecessary and inappropriate intrusion into the relationship between legal parents and their children." [26]

In 2004, the Delaware General Assembly repealed Delaware's 1983 version of the Uniform Parentage Act and enacted a new statute reflecting the UPA's 2000 and 2002 revisions and amendments.[27] As such, Delaware's Act not only served the original purpose of identifying fathers to collect child support, it also recognized the technological advances to determine parentage by genetic testing. Delaware's Uniform Parentage Act also went so far as to make some changes recognizing not all parents were married, and some parents were giving birth through assisted reproduction. But the Act did not include a provision for recognizing a status of *de facto* parents.

### Delaware Case Law Prior to Smith v. Gordon

Delaware Courts have a history of permitting persons other than a child's parents to undertake the role of custodian or guardian of that child. Having reviewed several of these decisions, I note Delaware Courts have been willing to grant parental authority to individuals over a child, but usually only in limited instances when a child only had one parent, and especially where maintaining the child with a surviving parent or two parents would cause the child to be neglected or dependent. In 1971, although pursuant to a Guardianship Petition filed by children's maternal grandparents, instead of a custody petition, the Delaware Court of Chancery determined that guardianship of the minor children should be awarded to the maternal grandparents after they had met the burden of proof to demonstrate Father's instability and lack of attention to his children during the several years the children resided primarily with their mother, who then died, and concluding that the grandparents had shown placement of the children with Father would make the children dependent and/or neglected.[28]

In 1982, in the case of *Martin v. Sand*, a Delaware Family Court Judge held it was in the child's best interest for the *de facto* custodians to be named as guardians of the child where it was shown neither Mother nor Father had the necessary parenting capability and skills to provide appropriate care for the child.[29] In that same Decision, the Court noted that natural parents should have the first right to care for their children, unless shown to be inadequate.[30] Furthermore, the Court stated the right of the natural parents should not be diminished just because a non-parent could show he or she was able to provide a child "with an easier or more luxurious life and greater perspective inheritance than the natural parents." [31]

In one of the first of the same sex partner decisions in Delaware, the Delaware Family Court in 2004 held the same sex partner of a biological mother qualified as a *de facto* parent.[32] The Court empha-

---

26. *Id.* at 11 (citing American Law Institute's "Principles of the Law of Family Dissolution: Analysis and Recommendations" § 2.03 (2000)(amended 2003)).

27. *Id.* at 1 and 12.

28. *In re Two Minor Children,* 283 A.2d 859 (Del.Ch.1971).

29. *Martin v. Sand,* 444 A.2d 309 (Del.Fam.Ct. 1982).

30. *Id.* (citing *In re Two Minor Children,* 283 A.2d 859).

31. *Id.* at 314 (citing *In re Klugman,* 256 Minn. 113, 97 N.W.2d 425, 430 (1959)).

32. *S.S. v. E.M.S.,* No. CN04–06303, 04–02491, 2004 WL 3245935 (Del.Fam.Ct. Nov.18, 2004).

sized both parties made a decision together to have children while in the relationship, and both parties were involved with raising the children from birth.[33]

In 2005, a Delaware Family Court Judge found a lesbian partner of a child's biological mother met the requirements of a *de facto* parent and could be equitably estopped from refusing to pay child support.[34] This case, like others of its kind, again emphasized the commitment between the same sex partners as to each other, as well as the commitment by the parties to seek the birth of a child which they would thereafter raise together. The two women in this case participated in a commitment ceremony, with one of the women eventually changing her former last name to the last name of her partner.[35] The two women discussed having a child together, and decided which woman would bear the child.[36] Both women took the class about the in vitro process and signed an "Injection Instruction Form."[37] Both women were involved during the birth of the child, and both women were committed to the child immediately following its birth until the time they separated.[38]

A review of all of these prior decisions demonstrates a history of Delaware cases, at least out of the Court of Chancery and Family Court, in which the theory of a *de facto* parent was used to give a third party custodial or guardianship rights over a child who was dependent or neglected in the care of both or the surviving biological

parent, or a child who was the product of an assisted reproduction or surrogate agreement pregnancy where two persons of the same sex were committed to each other and to the concept of causing the birth of a child and thereafter together raising that child.

In February 2007, a Delaware Family Court Judge determined that "preference for placement under the [Adoptions and Safe Families Act] does not extend to non-relatives that have been raised in the same foster homes."[39] The mother in the case wanted her dependent child placed in the home of a non-relative who mother considered her *de facto* sister by virtue of being raised together in the same foster home as children.[40] The Court distinguished between simply providing care for a child, such as a foster parent, from the same sex couple cases which emphasized the existence of a committed relationship and intent to create and raise a child together.[41]

With the trend in Delaware decisions being consistent with a national trend of recognizing the parental rights of same sex couples, the Court could not find a Delaware decision, or any decision elsewhere, which recognized the ability of a third party to obtain parental status of a child where the child already had two existing fit parents. In fact, in 2005, those circumstances, in a case very much like the one now before the Court, came before a Family Court Judge in Delaware.[42] In an unre-

33. *Id.*

34. *Chambers v. Chambers*, No. CN99–09493, 00–09295, 2005 WL 645220 (Del.Fam.Ct. Jan.12, 2005).

35. *Id.* at *1.

36. *Id.*

37. *Id.* at *2.

38. *Id.*

39. *T.P. v. T.P.*, No. CN05–04690, 2007 WL 1541916, at *1 (Del.Fam.Ct. Feb.20, 2007).

40. *Id.* at *2.

41. *Id.* at *4.

42. *Div. Family Services v. M.D.*, No. CN00–07072, 2005 WL 3507999 (Del.Fam.Ct. May 17, 2005).

ported Decision, the Family Court ruled the person claiming to be a *de facto* parent did not qualify as such when the child already had two biological parents who wanted to continue their parental relationship with the child and neither of whom agreed that the third party could have equal parenting rights with them.[43] In distinguishing the third party against two fit parents case from previously decided same sex couple cases in Delaware which granted *de facto* parent status, the Judge emphasized the same sex couple cases involved situations in which "the *de facto* parent had been in a committed relationship with the child's biological parent at the time the child was conceived and subsequently born and that the biological parent and the *de facto* parent had a specific intent to co-parent together."[44] This decision, although predating the present *de facto* parent amendment, recognized the existing policy adopted by Delaware Courts in using the *de facto* parent doctrine, but only in same sex couple cases, and not for a third party where two parents already existed.

### Statutory Inconsistencies with De facto Parent Amendment

The Court now turns to various inconsistencies presented by the wording of the recent *de facto* parent amendment with other existing statutory provisions of the Delaware Code. As already noted, the recently added wording of the *de facto* parent amendment to Delaware's Uniform Parentage Act suggests the possibility of a child having more than 2 capable parents. Other provisions of the Delaware Code relating to parents, however, only envision a maximum of two parents. Thus, the provisions regarding the payment of child support contained in Title 13, Section 501, of the Delaware Code, clearly envision a child having only two parents when it states the duty of support falls "equally upon *both* parents" (Emphasis added)."[45] The statute does not say the responsibility for support rests upon all parents. Likewise, the provisions regarding the general responsibilities of parents to their children contained in Title 13, Section 701, of the Delaware Code speak of a father and a mother having those responsibilities, but if the other dies, the responsibilities fall on the surviving parent. Again, only two parents are contemplated by the statute.

When reviewing the statutes the Court uses in determining child custody cases, the statutes speak of a custody petition filed by a parent, and upon filing, the automatic entry of a preliminary injunction against "*both* parents" (Emphasis added) from taking a child out of State.[46] Although the best interest standards set forth in Title 13, Section 722(a), of the Delaware Code requires a Family Court Judge to consider the wishes of the "parent or parents", the statute requires the Court to consider the compliance by "*both* parents" (Emphasis added) with Orders of the Court.[47]

Legislative directives regarding child contact contained in Title 13, Section 727(c) and (d) of the Delaware Code, require that any Custody Order provide a contact schedule for the child with "*both* parents" (Emphasis added), and also provides provisions where "one or *both* parents" (Emphasis added) enter into the mil-

---

43. *Id.*

44. *Id.* at *1.

45. Del.Code Ann. tit. 13, § 501(c) and (d) (2010).

46. Del.Code Ann. tit. 13, § 721(a) and (d) (2010).

47. Del.Code Ann. tit. 13, § 722(a)(1) and (6) (2010).

itary. Again, Title 13, Section 728(a), of the Delaware Code requires the Court to provide a visitation schedule for a child to the "*other* parent" (Emphasis added) with whom the child is not going to primarily reside, and also requires the Court to provide frequent and meaningful contact of a child with "*both* parents" (Emphasis added).

When considering these aforementioned inconsistencies, the Court also observes Title 13, Section 8–203 of the Delaware Code states "a parent-child relationship established under this chapter applies for all purposes, *except as otherwise specifically provided by other law of this State* (Emphasis added)." One must query whether the Delaware Legislature intended these prior provisions, which contained a maximum limit of two parents in custody and support actions, to be expanded by the present *de facto* parent amendment, which clearly seems to envision the possibility of more than two parents. If that was the Legislature's intent, one might have expected these pre-existing statutes to also have been changed. Or was it the Legislature's intent that these pre-existing laws would not be changed when, as already emphasized, Title13, Section 8–203, of the Delaware Code contains the exception which suggests the *de facto* parent parent-child relationship established in the Uniform Parentage Act is not intended to affect provisions, "otherwise specifically provided by other law of this State?"[48] Or, does the possibility exist the Legislature, in its haste to correct the effect on same sex couples by the Delaware Supreme Court's Decision in *Smith v. Gordon*, did not consider the very broad and overreaching consequences the *de facto* parent amendment would have in cases involving children who already had two parents?

Without limiting the number of other Delaware statutes which might be affected by the de facto parent amendment, the Court notes possible effects at least on the following important statutes and areas of law:

Title 10, Section 3724, of the Delaware Code—Wrongful Death Claims

Title 12, Section 101, of the Delaware Code—Definitions for Purpose of Wills and Intestate Successors.

Title 12, Section 508, of the Delaware Code—Parent-child Relationships in Intestate Successions.

### Shifting Societal Norms

Since the early 1970's, there have been at least three areas in our society which have undergone significant change, all of which have led to the issue now before this Court. The Court has already discussed the considerable scientific and technological advances which have caused the Uniform Parentage Act to change from simply setting rules establishing paternity through various presumptions or an actual acknowledgment to the very specific paternity determinations now available through genetic testing.

The second change, mainly through case law, has been the acknowledgment by many states of the rights of persons of the same sex to be considered parents of the same child where they have gone through various combined efforts of adoption, assisted reproduction or surrogate agreement.

Finally, and perhaps the biggest change in our society, which brings us to the present issue, is the change from what we once knew as the traditional American family. As Justice O'Connor described in her year 2000 United States Supreme

---

48. DEL.CODE ANN tit. 13, § 8–203 (2010).

Court Decision of *Troxel v. Granville,* "while many children may have two married parents and grandparents who visit regularly, many other children are raised in single parent households ... Understandably in these single parent households, persons outside the nuclear family are called upon with increasing frequency to assist in the everyday task of child rearing." [49] As Justice O'Connor noted the "nationwide enactment of nonparental visitation statutes is assuredly due, in some part, to the States' recognition of these changing realities of the American family." [50] It was likely rather easy at first for states to extend to grandparents and other relatives' protections to maintain parental-like relationships with a child so that these beneficial bonds formed between children and relatives would be maintained for a child's best interests in the event of a sudden disruption of the nuclear family. As Justice O'Connor considered this reality, she also stated the caveat which is now triggered by the extension of parental rights offered by Delaware's present *de facto* parent amendment. That caveat is the "extension of statutory rights in this area to persons other than a child's parents, however, comes with an obvious cost. For example, the state's recognition of an independent third-party interest in a child can place a substantial burden on the traditional parent-child relationship." [51] Justice O'Connor went on to state, "our terminology is intended to highlight the fact that these statutes can present questions of constitutional import." [52]

## Two Parents Per Child

In reaching the decision in this case, this Judge has read many Delaware decisions as well as many decisions issued from around the country. Common to the reading of all of these decisions is a limitation of only two parents per child. In the early years of the Uniform Parentage Act, the main purpose of the Act generally was to determine the father's identity. The advent of genetic testing improved the ability to determine a father's identity. However, with that improvement, certain rules had to be established to protect the bond of a child with a person who had identified himself as the child's father, but where it was later discovered the purported father was not the biological father. The rules continued to follow the formula of no more than two parents per child in preserving an intact relationship benefiting a child. The cases and rules providing parental rights to same sex couples have continued to follow the two parent per child equation. All of these cases have focused solely on two adults entering into an agreement from the beginning which resulted in the birth of a child with their agreement including thereafter raising the child. [53]

Delaware's statutory scheme has long involved only parents being able to bring an action for custody, except that third parties could bring an action for guardianship of a child if they could demonstrate a child would be dependent or neglected in a parent's care. [54] Even in an adoption, one

---

49. *Troxel v. Granville,* 530 U.S. 57, 64, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

50. *Id.*

51. *Id.*

52. *Id.*

53. The Court recognizes, of course, that not all conceptions between biological parents had as there initial intent and purpose the creation of a child.

54. DEL.CODE ANN. tit. 13, 721(e) (2010). Prior to an amendment in 77 Del. Laws, ch. 43, effective June 16, 2009, there may have been some question whether a non-parent could be awarded custody if the non-parent could prove the child would be dependent or neglected. In practice, however, Delaware

parent would have to have died, or had their parental rights terminated, before the Court would entertain an adoption petition.[55] Delaware adoptions presently require a social study and report from an approved agency before a decree of adoption can be granted.[56] Presently, in Delaware, except for placement of a child for adoption by an approved agency, only a stepparent, a blood relative, or a guardian or permanent guardian may file a Petition for Adoption to be considered a child's parent.[57] Are we to assume the Delaware Legislature intended to bypass these required protections so that Boyfriends can obtain parent status pursuant to the *de facto* parent amendment?

Other than recognizing as parents persons who are biologically tied to a child either directly, or through assisted reproduction or surrogate agreement, or through adoption, Delaware has never recognized any other individual as a potential parent who could seek custody, other than a stepparent. Even then, custodial rights of a stepparent can occur only in very limited circumstances. Thus, pursuant to Title 13, Section 733, of the Delaware Code, a stepparent may seek custody of a child, but only upon the death or disability of the custodial or primary placement parent where that child has been residing with the stepparent immediately prior to the death or disability of the custodial or primary placement parent. A 1998 Deci-

sion of the Delaware Supreme Court upholds this statute, and, in so doing, notes the careful limitations included in the Stepparent Custody Statute.[58]

In this Court's review of various statutes and cases around the country, the Court is of the opinion that the State of Delaware is the first state to create the possibility of a child having more than two parents. Delaware's new *de facto* parent statute sounds the alarm of the caveat expressed by United States Supreme Court Justice Sandra Day O'Connor, when she said in *Troxel,* the question places "a substantial burden on the traditional parent-child relationship ... and can present questions of constitutional import." [59]

### Due Process

■■■ The *Troxel* Decision reminds us there is a well established presumption that fit parents act in their children's best interest.[60] Furthermore, there is "normally no reason for the state to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children." [61]

*Troxel* resoundingly emphasizes a parent's interest to care and make decisions for their children "is perhaps the oldest of the fundamental liberty interests recognized by this Court." [62] As such, this interest is protected by the Due Process

Family Court Judges were only awarding custody to parents, with guardianship being reserved for awards to non-parents in cases where a child was found to be dependent or neglected.

**55.** Del.Code Ann. tit. 13, § 908 (2010).

**56.** Del.Code Ann. tit. 13, § 912 and 915 (2010).

**57.** Del.Code Ann. tit. 13, § 904(a) (2010).

**58.** *Tailor v. Becker,* 708 A.2d 626 (Del.1998).

**59.** *Troxel v. Granville,* 530 U.S. 57, 64–65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

**60.** *Id.* at 68, 120 S.Ct. 2054 (citing *Parham v. J.R.,* 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)).

**61.** *Id.* at 58, 120 S.Ct. 2054 (citing *Reno v. Flores,* 507 U.S. 292, 304, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)).

**62.** *Id.* at 65, 120 S.Ct. 2054.

Clause of the 14th Amendment of the Constitution of the United States. *Troxel* reminds us that "the Due Process Clause does not permit a state to infringe on the fundamental right of parents to make child rearing decisions simply because a State Judge believes a "better" decision could be made." [63]

Although stated in an Opinion concerning termination of parental rights as opposed to custody and visitation, we should also heed U.S. Supreme Court Justice Ginsberg's chilling words when delivering the Opinion in *M.L.B. v. S.L.J.*, wherein she stated "termination adjudications involve the awesome authority of the State "to destroy permanently" all legal recognition of the parental relationship." [64]

Delaware Courts have echoed these same concerns. Delaware's Court of Chancery in 1971 emphasized natural parents have the first right to the care and custody of their children.[65] In a similar vein, the Delaware Family Court in the 1982 Decision of *Martin v. Sand*, stated, "natural parents have first right to the care and custody of their children." [66] The Delaware Court went on to say, "this right will not be abrogated on a showing that a non-parent is able to provide the child with an easier or more luxurious life and greater perspective inheritance than the natural parents." [67] The Court, in *Martin v. Sand*, went on to state the final portion composing the trio of sacred rules followed

in Delaware regarding parents, that being parents rights shall only be disrupted when a Court makes a determination the child would be dependent or neglected if continued in that parent's care.[68] This trio of rules, (1) the parental right being a fundamental constitutionally protected right, (2) is not to be abrogated where a non-parent is able to provide an easier or more luxurious life, and (3) the only exception occurs when the child is found to be dependent or neglected in the parent's care, followed by both our United States Supreme Court and the Courts of Delaware are time honored, and have never deviated from a basic concept of a maximum of two parents for one child. Delaware's recently enacted *de facto* parent amendment clearly presents the possibility of diminishing and diluting the constitutional rights of fit parents.

Although Justice Kennedy issued a dissenting opinion in *Troxel*, much of his opinion concurred with the basic principles used by Justice O'Connor, and upon which this Court relies in making this decision. Justice Kennedy noted that all of the Justices' opinions in *Troxel*, whether concurring or dissenting, contained the common thread that a "custodial parent has a constitutional right to determine, without undue interference by the state, how best to raise, nurture and educate the child. The parental right stems from the liberty interest protected by the Due Process Clause of the 14th Amendment." [69] Jus-

63. *Id.* at 72–73, 120 S.Ct. 2054.

64. *M.L.B. v. S.L.J.*, 519 U.S. 102, 127, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (citing *Rivera v. Minnich*, 483 U.S., 574, 580, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987)).

65. *In re Two Minor Children*, 283 A.2d 859 (Del.Ch.1971).

66. *Martin v. Sand*, 444 A.2d 309, 314 (Del. Fam.Ct.1982) (citing *In re Two Minor Children*, 283 A.2d 859 (1971)).

67. *Martin v. Sand*, 444 A.2d at 314 (citing *In re Klugman*, 256 Minn. 113, 97 N.W.2d 425, 430 (1959)).

68. *Id.* (citing DEL.CODE ANN. tit. 13, §§ 901, 921, 937).

69. *Troxel v. Granville*, 530 U.S. 57, 95, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

tice Kennedy observed court-ordered visitation appeared to be a 20th-century phenomenon.[70] He went on to note that the earliest 20th century exceptions generally involved visitation by a relative who had acted in a parental capacity, such as grandparents, especially when one of a child's parents had died.[71] According to Justice Kennedy, the importance of certain bonded relationships with children, and the damage that can be done to children when those relationships are disrupted, must be considered.[72] He also cautioned that constitutional protections may become more evident as a court goes from considering the rights in a child of a close relative compared to that of "a complete stranger."[73] Justice Kennedy mentioned the hardships which litigation may cause a parent "struggling to raise a child ... faced with visitation demands from a third party."[74]

### Same Sex Parents

The combination of the technological advances both of genetic testing and assisted reproduction, along with a change in view from the traditional family concept of prior years, has given rise in the past decade or more to numerous decisions around the country concerned with the issue of whether a person can obtain parental and custodial rights of a minor where the minor was conceived by assisted reproduction or surrogate relationship during that person's committed intimate domestic relationship with another person of the same sex, and where both of these individuals made a joint decision to cause the birth of the child and thereafter raise the child. Through various legal fictions given such names as "The Psychological Parent," "*In Loco Parentis*," or "*De facto* Parent Doctrine*", many states, beginning at least as early as the year 1995, found that the non-biologically related or non-adoptive parent involved in such a committed relationship was entitled to rights of custody and visitation.[75] A few states declined to give such an individual parental, custodial, or visitation rights.[76] In fact, as already noted, the

**70.** *Id.* at 96, 120 S.Ct. 2054.

**71.** *Id.* at 97, 120 S.Ct. 2054.

**72.** *Id.* at 99, 120 S.Ct. 2054.

**73.** *Id.* at 100–01, 120 S.Ct. 2054.

**74.** *Id.* at 101, 120 S.Ct. 2054.

**75.** *Egan v. Fridlund–Horne*, 221 Ariz. 229, 211 P.3d 1213 (App.2009) (see, *e.g. E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886, 890 (1999) (adopting *de facto* parent doctrine); *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539, 555 (2000) (affirming visitation order based on psychological parent doctrine); *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 919–20 (2001) (recognizing common law doctrine of in loco parentis); *In Re Parentage of L.B.*, 155 Wash.2d 679, 122 P.3d 161, 177 (2005) (holding that Washington's common law de facto parent doctrine granted third-party standing); *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419, 439 (1995) (holding that courts can rely on equitable powers to grant

third-party visitation); *In re Interest of E.L.M.C.*, 100 P.3d 546, 559–61 (Colo.Ct.App. 2004) (finding that a statutory provision *implicitly* recognized the right of a psychological parent to seek visitation);see also *In re the Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995)).

**76.** *Egan v. Fridlund–Horne*, 221 Ariz. 229, 211 P.3d 1213 (Ct.App.2009) (see, *e.g. E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886, 890 (1999) (adopting *de facto* parent doctrine); *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539, 555 (2000) (affirming visitation order based on psychological parent doctrine); *T.B. v. L.R.M.*, 567 Pa. 222, 786 A.2d 913, 919–20 (2001) (recognizing common law doctrine of in loco parentis); *In Re Parentage of L.B.*, 155 Wash.2d 679, 122 P.3d 161, 177 (2005) (holding that Washington's common law de facto parent doctrine granted third-party standing); *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419, 439 (1995) (holding that courts can rely on equitable powers to grant third-party visitation); *In re Interest of*

Delaware Supreme Court in its 2009 Decision in *Smith v. Gordon,* despite several earlier Delaware Family Court decisions accepting the de facto parent doctrine on same sex couples cases, refused to find that the Delaware Legislature had recognized the right of a lesbian partner of a child's adoptive mother to have standing to seek custody of the child as a *de facto* parent.[77] Indeed, it was this Decision of the Delaware Supreme Court that likely prompted the Legislature's amendment to Delaware's Uniform Parent Act giving us the *de facto* parent statute amendment which is at the center of the present case.

### Third Party Custody Attempts

The present case is distinguishable from these many same sex couple decisions, because the present case involves Mother's former boyfriend seeking custody as a *de facto* parent of a child who already has two biological parents who have previously established a custody and visitation plan for their child. The biological father has maintained contact with the child and regularly met his child support obligation. The allegations contained in Boyfriend's supporting documents fail to demonstrate the child is dependent or neglected in the care of her biological parent or parents. Also, where Boyfriend never married Mother, but is not prohibited by doing so by State law, the Court questions whether Boyfriend's commitment to having a long lasting relationship with Mother could be judged as strong as the commitment

shared by the same sex couples, some of whom actually went through a formal ceremony although not necessarily sanctioned by State law.[78]

In the 2006 Decision of *Middleton v. Johnson,*[79] the South Carolina Court of Appeals permitted a mother's ex-boyfriend standing to seek visitation of her child. Mother had allowed the boyfriend to have visitation for over 9 years, even after testing proved that he was not the biological father of the child.[80] Although it is clear in the *Middleton* case that Mother gave overwhelming consent to her boyfriend, who performed even more of the primary responsibilities for the child than Mother, there is very little mention in the Opinion about the child's biological father's consent, or lack of it. However, the opinion noted the biological father never visited the child, which left a parental void for the child.[81] The *Middleton* Decision concluded with a cautionary statement that their Decision should not be interpreted to automatically give a psychological parent the right to demand visitation in a dispute between a legal parent and psychological parent, but exceptional circumstances would be necessary to overcome the wishes of the legal parent regarding visitation by third parties.[82]

In 2000, the New Jersey Supreme Court provided visitation rights to a same sex former domestic partner, but stated the

---

E.L.M.C., 100 P.3d 546, 559–61 (Colo.Ct.App. 2004) (finding that a statutory provision *implicitly* recognized the right of a psychological parent to seek visitation);see also *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419 (1995)).

   *Jones v. Barlow,* 154 P.3d 808, 815–19 (Utah 2007); *Stadter v. Siperko,* 52 Va.App. 81, 661 S.E.2d 494, 498–99 (2008).

**77.** *Smith v. Gordon,* 968 A.2d 1 (Del.2009).

**78.** Delaware does not recognize same sex marriages or civil unions.

**79.** *Middleton v. Johnson,* 369 S.C. 585, 633 S.E.2d 162, 162 (2006).

**80.** *Id.* at 172–73.

**81.** *Id.* at 170.

**82.** *Id.* at 172.

former partner was not entitled to joint legal custody.[83]

The New Hampshire Supreme Court in their 2003 decision *In re Nelson,* ruled a father who had petitioned for custody and support of his biological child with the child's mother, could not also maintain a custody petition for three children Mother had adopted.[84] The Supreme Court of New Hampshire first noted there is a presumption that a fit parent acts in the best interest of their child, and so long as a parent adequately cares for his or her child, or is fit, there will normally be no reason for the state to inject itself into the private realm of a family.[85] The New Hampshire Court acknowledged, however, a state also has a *parens patriae* interest in a child's welfare, and may intervene when a child's welfare is at stake.[86] Finally, the New Hampshire Court stated parents have a fundamental liberty interest to raise their children without interference, with that interest being deserving of the highest level of protection, and only to be disturbed in exceptional circumstances.[87] The New Hampshire Supreme Court found, when the parties were living together, Father repeatedly refused to adopt the children although he at times shared some of the child care responsibilities and financial support for these adopted children.[88] Thus, although Father in the *Nelson* case may have been present in the adopted children's lives, he never entered into the

legal formality of adopting the children as his own.

The failure of Boyfriend in the case *sub judice* to have ever entered into the formal and legally recognized status of marriage with Mother is a factor to be considered in this decision. Had Boyfriend married Mother, he at least would have been entitled to the legal consideration of a stepfather seeking custody in the limited circumstances of Mother's death or disability.[89] If the Court were to grant Boyfriend parental custodial rights pursuant to the *de facto* parent amendment, the Court would be awarding Boyfriend greater unlimited custodial rights than Boyfriend would be entitled to if he had made the commitment to marry Mother and become Child's legal stepparent. The Court doubts the Legislature intended to reward such a lack of formal commitment which would seem to discourage marriage.

In 2003, the California Supreme Court in the case of *Sharon S.* recognized the rights of a domestic partner to seek custody of a child conceived by artificial insemination of the other partner during the partnership.[90] But in February 2009, in a case much closer to the factual situation of the case *sub judice,* the Third District of the Court of Appeal of the State of California determined that Father's former girlfriend lacked standing to initiate a custody proceeding involving the children of Father and Mother.[91] The Court held Father's former girlfriend, despite she and

---

83. *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539 (2000).

84. *In re Nelson,* 149 N.H. 545, 825 A.2d 501 (2003).

85. *Id.* at 502.

86. *Id.* at 511.

87. *Id.* at 502.

88. *Id.*

89. Del.Code Ann. tit. 13, § 733 (2010).

90. *Sharon S. v. Superior Court,* 31 Cal.4th 417, 2 Cal.Rptr.3d 699, 73 P.3d 554 (2003) cert. denied, 540 U.S. 1220, 124 S.Ct. 1510, 158 L.Ed.2d 155 (2004).

91. *Scott v. Superior Court,* 171 Cal.App.4th 540, 89 Cal.Rptr.3d 843 (2009).

Father having experienced an intimate relationship for many years during which she lived with Father and the three children, had no standing to seek custody of the children.[92] The Court stated "there can only be two parents, not three."[93] The Court went on to say "in a same sex domestic partner relationship, a child may have two natural mothers (i.e., a biological mother and a mother meeting the presumed parent criteria . . .); but in a heterosexual relationship, there can be only one mother."[94]

In an even more recent case, the Supreme Court of Washington, on April 01, 2010, denied standing to a former stepfather who sought custody as a *de facto* parent because the child had two fit parents.[95] The child was born to the biological parents in 1993.[96] The biological parents separated shortly thereafter, and their divorce was finalized in 1995.[97] The biological parents entered into a parenting plan giving Mother primary residential custody, with Father having visitation.[98] Father paid his child support obligation.[99] There were no allegations that either biological parent was unfit.[100] When the child was about 14 months old, Mother and Stepfather began dating.[101] They were married in 1995, had two sons, separated 5 years later in 2000, and divorced in 2002.[102]

The Supreme Court of Washington's decision to deny standing to the former stepfather when the child already had two fit biological parents is of particular importance when one considers the State of Washington had previously issued at least one very important decision in which they granted *de facto* parent status in a same sex couple case.[103] The women in the same sex couple case had been intimate partners for 12 years.[104] One of them gave birth to a child after they agreed upon a plan that one of them would become pregnant and bear a child through artificial insemination.[105] In the Washington Supreme Court's same sex Decision *In re Parentage of L.B.*, decided in 2005, the Washington Supreme Court adopted a four point criteria, which the Washington Court had borrowed from the Wisconsin Supreme Court.[106] The four point criteria consisted of the following:

1) The natural or legal parent consented to and fostered the parent-like relationship,

2) The petitioner and the child lived together in the same household,

3) The petitioner assumed obligations of parenthood without expectation of financial compensation, and

92. *Id.* at 542–43, 89 Cal.Rptr.3d 843.

93. *Id.* at 544, 89 Cal.Rptr.3d 843.

94. *Id.* at 544–45, 89 Cal.Rptr.3d 843.

95. *In re Parentage of M.F.*, 168 Wash.2d 528, 228 P.3d 1270 (2010).

96. *Id.* at 1271.

97. *Id.*

98. *Id.*

99. *Id.*

100. *Id.*

101. *Id.*

102. *Id.*

103. *In re Parentage of L.B.*, 155 Wash.2d 679, 122 P.3d 161, (2005).

104. *Id.* at 164

105. *Id.*

106. *Id.* (using the test provided by the Wisconsin Supreme Court in *In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419, 435–36 (1995)).

4) The petitioner has been in a parental role *for a length of time sufficient to* have established with the child a bonded, dependent relationship, parental in nature.[107]

One cannot help but notice the similarity in wording, or at least in concept, between the Washington Supreme Court's criteria to determine a *de facto* parent set forth in its same sex couple case of *In re Parentage of L.B.* and the wording in Delaware's recently amended *de facto* parent statute. The Washington Supreme Court also added to their definition a requirement that the *de facto* parent in a same sex couple case is "limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life."[108] Again, did Boyfriend's commitment in the case *sub judice* reach this level?

Now we come to the best part in the comparison of the circumstances by the Washington Supreme Court between the same sex couple case and the third party case. When considering Stepfather's status in the 2010 decision of *In re Parentage of M.F.*, the Washington Supreme Court clearly stated the *de facto* parent test it had applied in same sex couple cases, such as *In re Parentage of L.B.*, could not be applied in a meaningful way in the stepparent context.[109] The Washington Supreme Court noted the obvious flaw in applying the four prong *de facto* parent test it had adopted in same sex parent cases to the stepparent case, because the elements would usually very easily be satisfied in the stepparent case.[110] The Washington Court recognized that most parents, when involved with a new spouse, are going to encourage the stepparent to form a relationship with the children as though they were a parent, and that the children will live with the parent and stepparent together.[111] Also, one can certainly expect a stepparent to help their spouse with the children and also attend various functions with their spouse in which the children are involved. The Washington Supreme Court concluded in the *M.F.* case the stepparent did not qualify as a *de facto* parent.[112] The Court also noted the Washington Legislature had provided a statutory remedy for a stepparent seeking a custodial relationship with a stepchild.[113]

### Conflict: De Facto Parent v. Third Party Visitation v. Stepparent

At this point in the Decision, the Court has reviewed certain constitutional premises established by the United States Supreme Court, and which have certainly been followed by Delaware and other States. The Court has noted the changes in Delaware's Uniform Parentage Act made necessary by improvements in technology and changes in society. The Court has also observed the development by Courts of the *de facto* parent and similar theories used to give parental rights to same sex partners in committed relationships. The Court has also pointed out some of the ambiguities between the new *de facto* parent amendment, which seems to envision the possibility of more than two parents, and other well established statutes and case law which clearly envision only two parents.

107. *Id.* at 176.

108. *Id.* at 177.

109. *In re Parentage of M.F.*, 228 P.3d at 1273.

110. *Id.* at 1273–74.

111. *Id.* at 1274.

112. *Id.*

113. *Id.*

There is also serious conflict between the more than two parent possibilities of the *de facto* parent statute compared to the two parent veto contained in the third party visitation statute amended about or at the same time as the *de facto* parent amendment.[114] Although the *de facto* parent statute certainly addresses more closely the ability of one to seek custody, while the third party visitation statute focuses on visitation, the irreconcilable distinction between a more than two parent custody statute and a two parent visitation veto statute is clear.[115] The Court cannot help but note the third party visitation statute contained in Title 13, Section 2412, of the Delaware Code presently contains a provision permitting two parents to veto the visitation while the *de facto* parent statute contains no such two parent veto. Even more, with the third party visitation statute clearly recognizing the ability of two parents to object, how will such a situation be handled if, under the *de facto* parent statute, a child is permitted to have three or more parents? The inconsistencies between these two statutes, adopted close in time, are serious both in the difference in number of parents envisioned and also in the difference of the protections given to the constitutional rights of parents.

The Court has already noted the considerable conflict in the custodial possibilities the *de facto* parent amendment in Title 13, Section 8–201, of the Delaware Code provide when compared to the provisions contained in Title 13, Section 733, of the Delaware Code which specifically give a stepparent the ability to seek custody, but only under very limited circumstances. Are we to understand the legislature intended to delete the Stepparent Custody Statute contained in Title 13, Section 733, of the Delaware Code with the passage of the *de facto* parent status amendment in Title 13, Section 8–201, of the Delaware Code? The Delaware Supreme Court, in the case of *Tailor v. Becker* in 1998, upheld the constitutionality of the Stepparent Custody Statute.[116] The Court emphasized the statute was "carefully limited." [117] The Court noted "the stepparent is not 'any other person.'" [118] Pursuant to Title 13, Section 733, of the Delaware Code, a stepparent only can seek custody when the stepparent basically steps into the shoes of the natural or adoptive parent with which they resided as a result of the parent's death or disability.

In *Tailor v. Becker*, the Delaware Supreme Court cited a rule of statutory construction which states "to the extent that there is any conflict between two or more statutes, the more specific and more recent controls." [119] Certainly, the *de facto* parent amendment is more recent than the Stepparent Custody Statute set forth in Title 13, Section 733, of the Delaware Code. However, the Stepparent Custody Statute is much more specific. Whereas the Stepparent Custody Statute provides the possibility of custodial standing to an individual who has not only been involved

---

114. DEL.CODE ANN. tit. 13, § 2412 (2010).

115. In *C.M.G. v. L.M.S.*, No. CN04–08601, 2009 WL 5697870 (Del.Fam.Ct. Dec.21, 2009), a Family Court Judge found the recently enacted third party visitation statute to be unconstitutional on the basis that the two parent veto provision of the statute did not provide similar protection where a child has only one legal parent.

116. *Tailor v. Becker*, 708 A.2d 626, 629 (Del. 1998).

117. *Id.*

118. *Id.*

119. *Id.* at 628 (citing *State v. Cook*, 600 A.2d 352, 355 (Del.1991)).

on a regular basis with a child, but, by marrying the parent, has certainly taken a legitimate step to demonstrate a permanent and unequivocal intent to be part of the relationship, the *de facto* parent amendment to Delaware's Uniform Parentage Act is overly broad. It fails to require any particular commitment such as evidenced by marriage or adoption, and it leads to the possibility of a child having numerous people who might qualify as a parent.

## CONCLUSION

■ This Decision has focused on the constitutional rights of parents. But make no mistake, the overriding focus in every child custody case is the child's best interest. Until the passage of the *de facto* parent amendment, Delaware statutory law only permitted a custody case to occur between two biological parents, or adoptive parents.[120] I emphasize "statutory law" in the preceding sentence, because the decisions of several Delaware Family Court Judges, already discussed within this Opinion, followed a national trend to expand the definition of parent to a *de facto* parent in order to accommodate the rapidly growing recognition of committed same sex couples agreeing to cause the creation of a child and thereafter raise the child together. As these same sex couples then separated, these decisions became necessary. The Delaware decisions, rendered without statutory basis, accepted and utilized the theory of a *de facto* parent in order to protect the child's best interests. These decisions recognized the potential harsh psychological impact that could be caused on a child when the child's relationship was severed from a person who had created

with the child since birth a time nurtured bond of love, support and affection.

The many decisions involving same sex couples recognize the importance of determining the intention and consent of each of the individuals leading to the conception and birth of the child. All of these cases, except where one of the persons in the same sex couple relationship adopted, involved a necessary hidden third party who participated in the child's conception as a donor, and possibly in the child's birth through surrogate agreement. One can only question whether the language in the *de facto* parent amendment which discusses having the consent of "the parent or parents" was so worded in order to be sure to include the donor or surrogate person. If such was the intent of the Delaware Legislature, applying its statutory amendment only to same sex couple cases, then the statute, with all of its criteria, would appear to be appropriate. But when the wording of the *de facto* parent statute is applied to the circumstances in the present action, which involves a third party seeking custody of a child who already has two fit parents, the statute raises constitutional concerns requiring this Court to exercise its necessary function to set aside the statute.

If a constitutional issue of parental rights existed in a same sex couple case, the clear factual demonstrations of consent certainly acted as a waiver of any parent claiming a violation of their constitutional rights. Thus, these same sex couple cases focused on the factual circumstances which evidenced the intended consent of the committed same sex couples towards the creation and joint raising of the child. Coupling this consensual intent with the

120. See DEL.CODE ANN. tit. 13, § 721(a) (2010) (permitting a custody action to be filed by a parent) and DEL.CODE ANN. tit. 13, § 801 (2010) (defining a "parent-child relationship" to mean "the legal relationship existing between a child and his or her natural or adoptive parents.").

longevity of the couple's relationship following a child's birth, together with the interaction of the same sex persons with the child, caused the Courts' focus to emphasize a child's best interest, as opposed to being concerned with constitutional issues.

Although several previous Delaware Family Court cases granted parental rights in same sex couple cases, one of the dissatisfied litigants in these cases finally chose to file an appeal to the Delaware Supreme Court in the case of *Smith v. Gordon*.[121] The Delaware Supreme Court held the decision of whether to give parental status to the non-biological or non-adoptive person in a same sex relationship was a public policy decision for the Delaware Legislature, and not for the Delaware Courts.[122] Because the Delaware Legislature had never adopted in its Uniform Parentage Act a section recognizing a *de facto* parent, the Delaware Supreme Court ruled such a status could not be recognized by the Family Court.[123]

The Delaware Legislature quickly responded to the Supreme Court's Decision in *Smith v. Gordon* by passing the present *de facto* parent amendment to Delaware's Uniform Parentage Act.[124] The wording used in Delaware's *de facto* parent amendment is strikingly similar to the tests Delaware's Family Court Judges, as well as other Judges around the country, had created in their decisions to determine whether *de facto* parent status was appropriate in same sex couple cases. The tests and wording of Delaware's *de facto* parent statute were not a result of creations from cases similar to the one now before the Court, which involves a boyfriend who claims standing to file a custody action of a

child who already has two biological parents.

Courts around the country, including Delaware, have always recognized the sacred constitutional rights of two parents to raise their children, with that right only being forfeited, sometimes only temporarily, when a child is found dependent or neglected in a parent's care. Although the concept of parent has expanded from two persons, male and female, creating a child through their biological union, to two persons of the same sex creating a child through their committed intentions and using assisted reproduction, all of these relationships have in common a biological nexus of two parents leading to a child's birth. The two individuals who in every case were involved in the creation of that child, whether intentionally as a same sex couple, or intentionally or accidentally as a result of a biological union of a male and female, are the only two persons who have been recognized as a parent to the child. Furthermore, so long as those two parents were willing to exercise their parental rights over their creation appropriately, other individuals could not usurp their authority. Although there might be temporary interruptions in a parent's authority, when the child was found dependent or neglected as a result of their care, the parent could resume their authority once they corrected the problem. Except for this temporary taking of a parent's authority, the only time another person could become entitled to the constitutionally protected status of parent was by stepping into the shoes of a parent who died or a parent whose rights were terminated, followed by adoption. In Delaware, the sole exception beyond the adoptive parent status is to step into the shoes of a spouse

121. *Smith v. Gordon,* 968 A.2d 1 (Del.2009).

122. *Id.* at 15.

123. *Id.* at 14–15.

124. Del.Code Ann. tit. 13, § 8–201(2010).

who has died or become disabled pursuant to the Stepparent Custody Statute contained in Title 13, Section 733, of the Delaware Code. Extending the sacred right of parenthood to more than two people dilutes the constitutional rights of the two parents.

Accordingly, and for the reasons stated herein, although petitioner, pursuant to the specific wording of the statute, may have standing, the Court finds the petitioner has no standing to bring a custody action for Child because the recent de facto parent amendment to Delaware's Uniform Parentage Act is overbroad and violates the due process rights of the parents under the Constitution of the United States and also under the Constitution of the State of Delaware.

Accordingly, the petitioner's Petition for Custody of Breanna Nickelson is hereby **DENIED** and **DISMISSED**.

IT IS SO ORDERED.